## Case No. 2,421.

### The CAROLINE A. WHITE.

[19 Leg. Int. 181; [1] 5 Phila. 112.]

District Court, E. D. Pennsylvania. 1862.

DEMURRAGE—FREIGHT NOT EARNED—LOSS OF VESSEL.

Under a contract of affreightment containing no provision that the payment of demurrage shall depend upon the earning of freight, demur-

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[1] [Reprinted by permission.]

rage for extra detention at an intermediate port of an entire voyage becomes absolutely due at such port, and it is recoverable though the vessel is lost in the return voyage.

[In admiralty. Libel for demurrage by the owners of the Caroline A. White.]

CADWALADER, District Judge. This is a suit for demurrage, under a charter-party for a voyage from Philadelphia to Cuba, and back to Philadelphia, New York or Boston. As to freight, the stipulations of the charter-party were, for the purposes of the case, the same, in effect, as if a single freight had been payable for the entire voyage. The vessel was to be dispatched as soon as possible, and in no event to be detained beyond fifteen days. For loading and discharging in Cuba, thirty lay days were allowed. The charter-party contained the words "demurrage, if any be incurred. twenty-five dollars per day." The vessel having been detained in Cuba more than thirty lay days, the libellants demand for this extra detention, demurrage at the stipulated rate. On the return voyage the vessel and her cargo were totally lost at sea. Therefore no freight was earned. The libellants insist that the demurrage is nevertheless due. Their demand for it is contested on the ground that the demurrage and freight, together. composed an entire compensation for the use of the vessel for the voyage. and that, as the voyage has not been performed, no part of this compensation has been earned. This objection is not sustainable, if it rests on a simple assumption that the demurrage was only a compensation to the owners of the vessel for their loss of opportunity to earn another freight. In support of the objection, a judicial dictum that "demurrage is only an extended freight," has been cited. See 4 Taunt. 52, 55. But this definition of demurrage is too narrow. Demurrage includes also compensation for the hazard of all such injuries and losses as may be caused by departure, in point of time. from the regular course of the intended voyage. Thus the compensation is not single but twofold. The dictum above mentioned may have been occasionally repeated; but judgments have also been pronounced in contested cases upon the ground that demurrage is not included in the most extended meaning of the simple word "freight." See 4 Taunt. 1; 1 Barn. & Adol. 118, 122; 4 El. & Bl. 945; 5 El. & Bl. 589. The damages for extra detention, which are payable under the name of demurrage, are usually, as in the present case, liquidated at a certain daily rate or sum. Were they not thus liquidated, their legal measure would often be questionable. Whether the extra delay had been the proximate cause, or too remote a cause, of unforeseen losses from political occurrences, from fluctuations of markets, or from periodical changes of climate. or of currents of wind or water, might become questions of almost constant recurrence. One of these questionable effects might sometimes be the loss of the vessel herself, and incidentally that of the freight for the voyage. When the rate of demurrage is liquidated, the character of the damage and of such hazards is nevertheless to be regarded. Their character would be disregarded if the recovery of the sum substituted for them were dependent upon the subsequent performance of the voyage. At a port of primary departure, a liability for demurrage may be incurred before any commencement of navigation. In another case of not unfrequent occurrence, the contract of affreightment requires the intended voyage to commence at a port where the vessel is not, and stipulates that she shall proceed thither for the purpose of performing the voyage. Under such a contract, any demurrage at this port of primary destination resembles demurrage at a port of primary departure. In either case the period of retardment is not a part of the time of navigation. See Poth. Charte Partie, art. 85. In each case the demurrage becomes absolutely due, independently of any question whether freight is afterwards earned. At a port of ultimate destination, a vessel detained with her cargo on board more than the stipulated number of lay days, or, in the absence of a stipulation, delayed beyond a reasonable time, becomes a mere substitute for a warehouse on shore. In such a case, freight is not earned until the demurrage begins to accrue. This was decided by the supreme court of Pennsylvania in a case in which the vessel and cargo were wholly lost during the lay days. But Chief Justice Tilghman gave no opinion what the law would have been if she had been detained by the hirer beyond the lay days, and the loss had happened while demurrage was accruing. 4 Bin. 299, 308. The proposition that, if detention by the hirer prevented the discharge of the cargo, the freight would have become absolutely due so soon as the demurrage began to accrue, was consistent with the decision, and with all the reasoning in support of it. The decision and reasoning are also consistent with the proposition as to demurrage, that if she had been lost with her lading while the demurrage was accruing, it would have been recoverable to the time of such loss. In the present case, the extra detention was at an intermediate port of an entire voyage. The demurrage in question may, therefore, be regarded as having, in a certain sense, accrued in the course of navigation. In this respect the case may be distinguishable from the others which have been mentioned. But, is the distinction attended with any difference which is material to the question for decision? The definition of demurrage does not essentially require that the extra detention shall have been exclusively in port. Formerly vessels intended for the trade monopolized by the British East India Company, were built under contracts by which the

owners engaged to let them to freight to that company for several voyages, upon the terms of their printed charter-parties for vessels employed in their service. Thus an exclusive employment of the vessels in it for many years, was provided for before they were built. Lord Mansfield said of the company's printed charter-party, that it was "an old instrument informal, and, by the introduction of different clauses at different times, inaccurate, and sometimes contradictory;" adding that, "like all mercantile contracts, it ought to have a liberal interpretation." 1 Doug. 277. See 1 Taunt. 463; 3 Doug. 419; 4 Doug. 28; and the forms in the English editions of Montefiore's Precedents, from which those in 4 Chit. Commer. Law, 269–317, are taken. In this instrument, the compensation payable by the company to the shipowner was described, in part as freight, and in part as demurrage, the former being a certain sum per ton for the regular period of the voyage, and the latter a certain sum per day for further detention, with no discrimination, whether the liability for either was incurred from the use or detention of the vessel in port, or at sea. It was expressly provided, that the company should not be liable for any of the sums agreed to be paid for freight, or for demurrage, unless the vessel should return to the Thames, and safely deliver her cargo to the company. This proviso was qualified in the later charter-parties by certain exceptions. Before their introduction a vessel had been chartered by the company, with an option to load her homewards within three months after her arrival in India, or to detain her there for a year longer at certain rates of demurrage. She arrived in India, and remained there in the company's employment for the fifteen months; after which the master notified them that unless they would allow demurrage, according to the rates of the charter-party, be protested against them for all damages, loss of time or other accidents. The company thereupon agreed in writing, that the owner of the vessel should be allowed demurrage, for so long a time as she should be detained in their service in India. She was detained accordingly, and while employed there in the company's service was wholly lost in a storm. In a suit by her owner against the company, the questions were, whether he was entitled to recover by reason of her not having been dispatched or laden homeward, at the expiration of the fifteen months from her arrival outward; and, if not, whether he was entitled to demurrage. After several arguments the company offered, by way of compromise, to pay the demurrage to the time of her loss, "which was accepted; after which Lord Mansfield declared the court was very clear that the plaintiffs were entitled to no more; but declined giving any other opinion." 1 W. Bl. 291. The report of the case is a little obscure. The point in doubt under the sec-

ond question probably was, whether the proviso in the charter-party, placing demurrage on the same footing with freight, was applicable to demurrage accruing after the period of extra detention, to which the stipulations of the charter party had been applicable. If this was the point on which the court would not express an opinion, it may be inferred that if the charter party had contained no such proviso, there would not have been any difficulty in recovering demurrage to the time of the loss of the vessel. In that case, her loss, though it would have been fatal to the claim for freight, would not have been an obstacle to the claim for demurrage.

The case of an occasional charter party, like the present, when the extra detention has occurred at an intermediate port of an entire voyage, is more simple. The master usually receives the demurrage money there, and applies it to the expenses incurred through such detention. There is no trace, I believe, of an action, or claim, by the hirer of the vessel against her owner for the restoration of such money, on account of a subsequent loss of the vessel and cargo. Such actions have, on the contrary, been maintained where advances have been made in anticipation of freight to be earned. 4 Barn. & Ald. 582. Such advances are distinguished in the cases on the subject from freight payable in advance. The latter is due whether the voyage is afterwards performed or not. 4 Maule & S. 37. This appears to have been understood as the rule in England concerning freight, for nearly two centuries. 2 Show. 283; 3 Barn. & Adol. 450, 451. The words usually contained in the demurrage clause of a formal English charter party, seem to preclude the hirer of a vessel, who has paid the demurrage at an intermediate port from afterwards reclaiming it, if the voyage is not performed. Such demurrage is usually made payable at a certain pecuniary rate per day, for each and every day of the extra detention in port. That these words are expressive of the meaning which would be implied without them, and are not interpretable as creating a special contract, of a peculiar character, appears upon a comparison of these formal charter parties, with what are called in the notarial formularies, memorandums of charter. The memorandum of charter, which is intended to have the same effect as the more formal contract of affreightment, does not contain the words, "for each and every day," but simply ascertains the rate per day. No difference can have been intended to arise from the omission of the former words. Therefore none should be implied. This remark is perhaps important because, in the United States, memorandums of charter are constantly met with in both forms. They sometimes, after ascertaining the number of lay days, provide that "in case the vessel is longer detained," the hirer shall pay to the owner "demurrage at

the rate of" so much "per day. day by day, for every day so detained, provided such detention shall happen by default of the hirer or his agent." In other instances. as in the present case, the succinct expression demurrage at so much per day is substituted.

The legal application of a word should always be uniform unless a necessary reason for modifying its application can be shown. A contrary rule would produce uncertainties from which multiplied litigations might ensue. Demurrage understood in the sense of compensation for extra delay in a port of primary departure, incurred, as has already been said, before the commencement of navigation, must be recoverable. though the vessel should be afterwards lost. We have seen that there is no necessary reason that the demurrage, at an intermediate port, should be considered as dependent upon the subsequent earning of the freight. The fair inference from the use of the word demurrage is to the contrary. A different intention, where it exists, may be declared by an express provision of the contract of affreightment. as was done in a recent instance (1 Scott, N. R. 340). and in the charter parties of the East India Company, which have been mentioned.

The decree should therefore be for the libellants.